STATE of Arkansas *v.* 26 GAMING MACHINES

03-173                                        145 S.W.3d 368

Supreme Court of Arkansas
Opinion delivered February 5, 2004

48

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellant.

*Pryor, Robertson & Barry, PLLC*, by: *C. Brian Meadors*, for appellee.

R OBERT L. BROWN, Justice. This is a State appeal from an order of the Sebastian County Circuit Court in which the court found that three countertop Megatouch machines were not gaming devices *per se* and that the State had failed to provide evidence that the machines actually were used as such. Accordingly, the court refused to forfeit the machines and ordered them returned to their owners. The State argues one point on appeal: that the circuit court's refusal to forfeit the three alleged gaming machines was clearly erroneous. We disagree and affirm the circuit court's order.

In May 2002, the Fort Smith Police Department identified 28 suspected gaming machines in various Fort Smith businesses. Of the 28 machines, a gaming machine expert determined that 26 machines violated Arkansas law as gaming devices. On June 28, 2002, the prosecuting attorney filed a petition to forfeit the machines, and on July 3, 2002, and July 24, 2002, the circuit court issued summonses for the machines from the various businesses.

A raft of pleadings, motions, and discovery petitions ensued, and on October 30-31, 2002, the circuit court conducted a non-jury trial. At the trial, Robert Sertell was called as an expert witness for the State. He testified that he was a retired gambling teacher who at the time of trial served as the chairman of Casino Horizons Corporation, a training and consulting firm for the gaming industry as well as law enforcement. He became involved in conducting a gaming-machine investigation in Sebastian County in the summer of 2002 and created a twelve-page report on the various machines seized. He concluded that some of the games offered on the countertop and the free-standing machines were for gambling and some were not. The free-standing machines, according to Mr. Sertell, were designed to look like slot machines, operate like slot machines, sound like slot machines, and payoff in credits or points in almost the same way a slot machine does, with no skill required of the player. Of the 26 machines seized, all 26 required money to play, and some contained ticket dispensers.

Mr. Sertell testified that gambling consists of three elements: consideration, chance, and reward. He said "consideration" means that money must be paid to buy the right to play a game. "Chance" means that the player can do nothing to change or predict the outcome of the game. And "reward" means that the design of the game may entitle the player or winner to become entitled to something of value. All of the machines in question exhibited the element of "consideration," because they accepted either coin or paper currency. All of the machines involved "chance," he said, because they contain a random number generator or a reflexive game element. Some of the machines exhibited "reward" in the form of (1) points, which could be used as additional consideration to "buy" additional credits; (2) the ability to play the game without spending more money; or (3) a visual reward from seeing a virtual person take off his or her clothes. Mr. Sertell, however, denied that nudity was the type of reward that qualified as an element of gambling.

With respect to 19 of the 26 machines, the State and their owners either settled the litigation during the trial, or the machines were deemed to be inoperable and were returned to their owners, or the machines were forfeited to the State because no claim was filed by any purported owner. Of the remaining seven machines, four were upright, free-standing machines, and three were countertop Megatouch machines with touch screens. The court described the free-standing machines as Fruit Bonus 96 machines. The court likened the free-standing machines to slot machines that did not require any skill for use and were based upon chance. The court found that the free-standing machines were not amusement devices but were gaming devices *per se* subject to seizure and forfeiture. The court further concluded that the money seized from these machines was subject to forfeiture.

The three remaining machines were countertop Megatouch machines, which contained fifty-to-seventy different games, including draw poker, joker poker, and blackjack. These machines did not contain any type of pay out mechanisms such as hoppers or chutes for monetary winnings or pre-printed tickets. Accordingly, the court found that the countertop machines were not gaming devices *per se*. In making this finding, the court said:

> The State argues and it's [*sic*] expert testified that if the machine offers a game of poker and nothing more, it could still be considered a gaming device and subject to seizure and forfeiture. To hold such could, in the Court's opinion, subject a personal computer or a child's hand held computer game to seizure simply because a poker game may be included in the computer game. There must be more.

The court also found that the State failed to provide any evidence that the countertop machines actually were used as gambling devices. Specifically, the court found that the State had failed to show there was any reward for playing the countertop machines. Accordingly, the court concluded that the three countertop machines were not forfeitable and should be returned to their owners together with any money seized from these three machines, after expiration of the appeal time or the State's decision not to appeal.

The State argues as its sole point on appeal that the circuit court's refusal to forfeit the three alleged gaming machines was clearly erroneous. The State urges that the machines were seized pursuant to Ark. Code Ann. § 5-5-101(a) and (b) (Repl. 1997) and that the circuit court erroneously misconstrued its expert's testi-

mony. The State also argues that the circuit court's reliance on *Burnside v. State*, 219 Ark. 596, 243 S.W.2d 736 (1951), was misplaced, because unlike the *Burnside* facts, where the equipment in question did not constitute gaming devices *per se*, here the State contends that the three machines were gaming devices *per se*. The State asserts that the inclusion of poker and blackjack software made these machines comparable to the facts in *Bell v. State*, 212 Ark. 337, 205 S.W.2d 714 (1947), where this court found that slot machines were gaming devices *per se*. The State continues by arguing that machines that offer poker or other casino games through software are designed for the purpose of promoting gambling, just like slot machines.

Alternatively, the State argues that if this court concludes that the machines were not gaming devices *per se*, the circuit court erred in finding that the machines were not actually used as gaming devices. The State acknowledges that its expert, Mr. Sertell, testified that viewing a nude woman on video strip poker was not a reward for gambling purposes. However, because § 5-66-104 requires a gaming device to have a purpose of "playing a game of chance, or at which any money or property may be won or lost," and because *Rankin v. Mills Novelty Co.*, 182 Ark. 561, 562, 32 S.W.2d 161, 162 (1930), defined "property" as "any thing that is esteemed of value," one could conclude that a virtual striptease qualified as a reward for purposes of the gaming statutes.

■ Our standard of review is whether the circuit court's findings in the bench trial were clearly erroneous. *See Sharp v. State*, 350 Ark. 529, 88 S.W.3d 848 (2002). A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* We review the evidence in the light most favorable to the appellee. *Id.*

*a. Gaming Devices*

Our state's Gambling Code is found at Arkansas Code Annotated §§ 5-66-101 through 5-66-119 (Repl. 1997). The Code expressly requires judges to construe the statutes that prohibit gaming liberally "with a view of preventing persons from evading the penalty of the law by changing of the name or the invention of new names or devices that now are, or may hereafter be, brought into practice." Ark. Code Ann. § 5-66-101 (Repl. 1997). The Gambling Code prohibits possession of gaming devices:

> Every person who shall set up, keep, or exhibit any gaming table or gambling device, commonly called A.B.C., E.O., roulette, rouge et noir, or any faro bank, or any other gaming table or gambling device, or bank of the like or similar kind, or of any other description although not herein named, be the name or denomination what it may, *adapted, devised, or designed for the purpose of playing any game of chance*, or at which any money or property may be won or lost, shall be deemed guilty of a misdemeanor and on conviction shall be fined in any sum not less than one hundred dollars ($100) and may be imprisoned any length of time not less than thirty (30) days nor more than one (1) year.

Ark. Code Ann. § 5-66-104 (Repl. 1997) (emphasis added). This statute was first enacted by the General Assembly in 1837. *See* Revised Ark. Stat., ch. XLIV, art. III, § 1 (1837).

### b. Gaming Devices per se

This court has examined several cases over the years in which it found that machines were gaming devices *per se* under the statute. If a machine is found to be a gaming device *per se*, mere possession of it is punishable under § 5-66-104. *See Bell v. State, supra.* One early case examined by this court involved a Baseball Mint Vender that, in exchange for one nickel, distributed mints and tokens. *See Rankin v. Mills Novelty Co., supra.* Upon depositing the tokens into the machine, the player could play a symbolic game of baseball. This court found that a number of tokens obtained for a nickel's worth of consideration was an element of chance and that the right to play the game was considered "property" or a "thing of value." We deemed this machine to be a gaming device, because it was one that was "adapted or designed for the purpose of playing any game of chance or at which any money or property may be won or lost," and players were induced to "spend their nickels, not for the mints, but for the possibility of the game." 182 Ark. at 562-63, 32 S.W.2d at 162.

In a second case, we examined two slot machines, where one was used partly for gambling and partly for amusement and the other was used solely for gambling, after which the patron with the largest score won the game and a prize. *See Steed v. State,* 189 Ark. 389, 72 S.W.2d 542 (1934). In *Steed,* we held that the machines were gaming devices based on the description of the machines and based on the fact that the only reasonable and profitable use of the machines was a game of chance. This court has also held that a machine was a gaming device *per se* even where no prize was

awarded. *See Stanley v. State*, 194 Ark. 483, 107 S.W.2d 532 (1937). In *Stanley*, the machine in question was an electric baseball marble slot machine in which the player, in exchange for a nickel, could win one or more runs, an extra run, or no runs by chance. No prize or premium of any kind was offered by the owner of the machine for obtaining any result on the game. *Id*. However, this court held that the machine was susceptible to use as a gambling device in the same manner as any other similar marble machine. Thus, it was determined to be a gaming device *per se*.

In a fourth case, we examined twenty-seven slot machines that were not actually set up and in use to serve the public. *See Bell v. State, supra*. In *Bell*, we said that the statute did not require the machines to be "set up and ready to operate before they may be seized and destroyed. . . . [T]he keeping of these machines is made a misdemeanor, and their possession, at any place in this state, is outlawed." 212 Ark. at 338, 205 S.W.2d at 715.

More recently, this court held that a telephone-card vending machine, which allowed the patron to redeem points with the value of one penny per point or to play a game for the chance to win additional money, was a gaming device "designed for the purpose of playing a game of chance at which any money or property may be won or lost." *Pre-Paid Solutions v. City of Little Rock*, 343 Ark. 317, 323, 34 S.W.3d 360, 363 (2001). We held that it was of no consequence that the patrons could play the game without making a purchase. And in *Sharp v. State, supra*, this court held that machines dedicated solely to video poker and video slot machines were gaming devices subject to destruction, because the reason to play the machines was to play a game of chance in which the player won or lost credits. The element of chance was between the player and the business, and the player could obtain more credits with a good hand of poker and could exchange his or her credits for a prize.

### c. Amusement Devices

A separate section of the Arkansas Code regulates amusement devices. *See* Ark. Code Ann. § 26-57-401 through -409 (Repl. 1997 and Supp. 1999). Amusement devices are defined in part as follows:

> (1) "Amusement devices" means any coin-operated machine, device, or apparatus which provides amusement, diversion, or entertainment and includes, but is not limited to, such games as radio rifles, miniature football, golf, baseball, hockey, bumper pool,

tennis, shooting galleries, pool tables, bowling, shuffleboard, pinball tables, marble tables, music vending phonographs, jukeboxes, cranes, video games, claw machines, bowling machines, *countertop machines*, novelty arcade machines, other similar musical devices for entertainment, and other miniature games, whether or not such machines show a score, and which are not otherwise excluded in this subchapter[.]

Ark. Code Ann. § 26-57-402(1) (emphasis added). Toys, novelties or representations of value redeemable for those items may be won up to a maximum of $5.00. Ark. Code Ann. § 26-57-402(2)(A)(ii) (Supp. 1999). Nothing in the amusement-device section is deemed to legalize slot machines "or any machine equipped with any automatic money payoff mechanism." Ark. Code Ann. § 26-57-403(a) (Repl. 1997).

■ The first issue for this court to resolve is whether the three Megatouch countertop machines are gaming devices *per se.* We conclude that they are not. The circuit court, in its order found that these countertop machines "contain anywhere from 50 to 70 different games." Among those games are draw poker, joker poker, and blackjack, according to the court. The court further found that these machines "do not have any type of pay out mechanisms;" nor are there "hoppers or chutes for monetary winnings." Based on these findings, we disagree with the State's position that these are machines "adapted, devised, or designed for the purpose of playing any game of chance," as § 5-66-104 requires. Rather, the countertop machines themselves appear to have been created for the purpose of playing games of amusement and not for purposes of gambling. This is highlighted by the fact that the software can include as many as seventy games, the vast majority of which are benign as the State readily admits. Only three of those games have been called into question in the instant case.

■ In addition, countertop machines are specifically listed as amusement devices under § 26-57-402(1), and the three machines in question clearly are not equipped with any automatic payoff mechanism, which could have made the machines suspect under § 26-57-403. It is incumbent upon this court to harmonize our gaming statutes with our amusement-devices statutes, and having done so, we are convinced that the machines at issue qualify more readily as amusement devices.

■ We admit that we live in an era of advancing technology replete with daily computer and software advances. We further recognize that our gaming statute, § 5-66-104, has been on the books since 1837 and undoubtedly has not kept up with the times. Surely, it was enacted well before the period when computers could be instantly programed to play different games based on the software or computer chips employed. On that point, we have discovered no effort by the State to attempt to eliminate the three suspect games from the software involved in the instant case. Like the circuit court, we are reluctant to subject a child's hand held computer game to seizure simply because poker may be included as one of a dozen or more computer games. We affirm the circuit court on the point that the three Megatouch countertop machines are not gaming devices *per se.*

*d. Actual Use*

The State also challenges the circuit court's finding based on the fact that the three Megatouch countertop machines are actually used for gambling. This court has examined several cases in which it has found that machines, as actually operated, were gaming devices. In an early example, we held that dice and a cloth pinned to the ground were gaming devices, when used for the purpose of "shooting craps." *See Johnson v. State,* 101 Ark. 159, 141 S.W. 493 (1911). We said:

> [t]he instrumentality or structure which is furnished, by which the game is played, is not material. Any instrumentality by means of which the chance or skill, or both combined, are developed may constitute a gambling device. The gambling device may consist of dice and the throwing thereof. If the instrumentality is adapted and designed for the purpose of playing a game of chance for money or property, and is so used, then it constitutes such a device which comes within the prohibition of this section of the statute against gaming.

*Johnson v. State,* 101 Ark. at 163, 141 S.W. at 495.

Along the same line, in 1943, this court found that two teletype machines were gaming devices, as operated, because the owner intentionally converted these teletype machines to an unlawful use and purpose by betting on horse races, where money could be won or lost. *See Albright v. Muncrief,* 206 Ark. 319, 176 S.W.2d 426 (1943). In that case, the owner of the machines received information about upcoming horse races, which he then

passed along to "bookies," whom the owner knew used the information for gambling. *See Albright v. Muncrief, supra.* The court justified destroying these machines, because:

> the evil effects flowing from the use of instrumentalities designed for lawful use, when put to an unlawful use, would be just as great as when such machines were designed for unlawful purposes. Our lawmakers have gone far in their attempt to suppress the gambling evil and in so doing have given our enforcement officers authority to destroy the tools by the use of which gambling is carried on.

*Albright*, 206 Ark. at 326, 176 S.W.2d at 430. This court has also examined a pinball machine that allowed the player to accumulate free games. *See Bostic v. City of Little Rock*, 241 Ark. 671, 409 S.W.2d 825 (1966). In *Bostic*, the pinball machine was a gaming device, as operated, because the owner paid winners one nickel for every free game won. We said that merely setting up a machine that gives free games is not considered gambling, but when the free games won on the machine were converted to cash by the owner, the machine clearly became a gaming device.

In the case specifically relied on by the circuit court in its decision, this court held that evidence presented at trial was insufficient to conclude that machines were gaming devices. *See Burnside v. State, supra.* In *Burnside*, the State seized a tape recorder, a ticker or teletype machine, and a radio transmitter. This court held, however, that there was no showing that the equipment was ever used as gaming devices, and the owner of such equipment did not violate Arkansas' gambling laws. *See also Blankenship v. State*, 258 Ark. 535, 527 S.W.2d 636 (1975) (a ledger, three sheets of yellow paper with tickets wrapped inside them, a cigar box containing tickets, three sheets of yellow notebook paper, newspapers containing current racing forms, telephones, some yellow legal pads, and some checks were not found to be gaming devices, because there was no proof that the owner ever made a specific bet).

In the case at hand, the State argued that the circuit court erroneously found that the Megatouch countertop machines were not gaming devices, as operated. We disagree. Mr. Sertell testified for the State that the act of gambling required the elements of consideration, chance, and a reward. No tokens, money, or prizes were offered in connection with these machines. However, the State now argues that the reward offered in connection with a

game installed on two of the countertop machines, specifically strip poker, is a visual reward. This argument was not made to the circuit court and, thus, is not preserved for our review. *See Parker v. Perry*, 355 Ark. 97, 131 S.W.3d 338 (2003) (citing *T&T Chemical Inc. v. Priest*, 351 Ark. 537, 95 S.W.3d 750 (2003) (To preserve an issue for appeal, the trial court must be apprised of the particular error alleged. An appellant may not change the basis for his arguments or raise issues for the first time on appeal. This court will not consider an argument not properly preserved at trial.)). Moreover, this court has never held that an intangible reward, such as viewing nudity, qualifies as a reward for gambling purposes. In short, these countertop machines are more akin to video arcade machines intended for amusement, because a player inserts money and can play gambling-like games but never receives anything in return except amusement. We agree with the circuit court that these machines are not actually used for gaming due to the absence of any payoff mechanism or reward.

Affirmed.

DICKEY, C.J., not participating.

GLAZE and THORNTON, JJ., dissent.

RAY THORNTON, Justice, dissenting. I respectfully dissent from the majority's holding that a device that offers video-poker for a fee is not a *per se* gambling device.

The majority correctly cites the applicable Arkansas gaming laws at Ark. Code Ann. § 5-66-101 through § 5-66-119 (Repl. 1997), and acknowledges the policy of the State to construe these statutes "with a view of preventing persons from evading the penalty of the law by changing of the name or the invention of new names or devices that now are, or may hereafter be, brought into practice." Ark. Code Ann. § 5-66-101 (Repl. 1997). Our statutes make it a crime to possess any gambling device, defined as a device that may be "adapted, devised, *or designed for the purpose* of playing *any game of chance*, or at which any money ... may be won or lost." Ark. Code Ann. § 5-66-104 (Repl. 1997) (emphasis added). Arkansas law does except "amusement devices," as defined in Ark. Code Ann. § 26-57-402 (Supp. 1999). Whether such an exception passes constitutional muster is not an issue in this case because video- poker is not listed as an "amusement device" to be exempted from the laws prohibiting gambling.

Indeed, we held video-poker games to be gambling devices *per se* in *Sharpe v. State*, 350 Ark. 529, 88 S.W.3d 848 (2002). Furthermore, *per se* gambling devices are not required to offer a payout or prize. *See Stanley v. State*, 194 Ark. 483, 107 S.W.2d 532 (1937). The devices in this case require a fee and offer video poker. We specifically held that video-poker is not excepted from Ark. Code Ann. § 5-66-101 through § 5-66-119 as an "amusement device" under Ark. Code Ann. § 26-57-402 (Supp. 1999). *Sharpe, supra.*

It is of little consequence that the machines have the software for a greater number of games as well as video poker. Under the majority's reasoning, the owner of machines prohibited in *Sharpe, supra,* could avoid penalty of law for possessing a gambling device by surrounding the offending games of chance, such as video-poker or slot machines, with a plethora of other games characterized as amusement devices. This defeats the purpose of Ark. Code Ann. § 5-66-101 through § 5-66-119. Arkansas law requires us to interpret the gambling statutes strictly to prevent new technologies or nomenclature from defeating the purpose of the laws. Thus, the inclusion of software allowing other games to be played on these video-poker machines should not immunize video poker from the provisions of Ark. Code Ann. § 5-66-104; this statute defines a gambling device as a device "designed for the purpose of playing any game of chance." Certainly that is the situation here. If the General Assembly decides to re-define the definition, it is the body to do so, not this court by opinion.

For these reasons, I respectfully dissent from the majority's opinion.

I am authorized to state that Justice GLAZE joins in this dissent.